OPINION
Paul Y. Hurier, individually, and as administrator of the estate of Constance M. Hurier, deceased, and as parent and next friend of Natalie Hurier, a minor; Damien Hurier, a minor; Philip Hurier, a minor; Vincent Hurier, a minor; Jean-Lu Hurier, a minor; and Gabriel Hurier, plaintiffs-appellants (collectively referred to as "appellants"), appeal the October 25, 2001 judgment of the Ohio Court of Claims in favor of the Ohio Department of Transportation ("ODOT"), defendant-appellee.
On January 18, 1993, Paul Y. Hurier asked his son, Gabriel, who was seventeen years old at the time, to drive his sister Natalie to her school for an examination. Paul drove Natalie and his mother, Constance, in the family's 1989 Dodge Caravan. After Natalie completed the examination, Gabriel and his mother, who was riding in the passenger seat, picked up Natalie, and Gabriel proceeded to operate the van on State Route 125 toward the family home in Amelia, Ohio. State Route 125 is a four-lane divided highway with a maximum speed limit of fifty-five miles per hour. During the ride, Constance and Natalie, who was riding in the backseat, fell asleep. Gabriel noticed he was getting drowsy also, and attempted to keep himself awake by pinching himself and blinking his eyes. However, Gabriel eventually fell asleep one mile from home.
The vehicle drifted from the left lane to the right lane, exited the roadway, struck a mailbox, proceeded down a shallow drainage culvert, and then collided with the end of a drainage pipe and decorative brick wall. The drainage pipe ran underneath the driveway of a private residence that was perpendicular to State Route 125. The two decorative walls on each side of the driveway enclosed the pipe and extended above the level of the driveway so as to form a guardrail for both sides of the driveway as it passed over the pipe and drainage culvert. The decorative walls were built in 1973 at the same time the private landowners, Paul and Lillie Gumm, constructed their residence. The center of the decorative brick walls was seventeen to eighteen feet from the edge of the road. The brick structure extended on both sides of the pipe several feet toward the road and several feet toward the residence. The walls were constructed of a single layer of eight-inch concrete bricks surrounded on both sides by three-and-one-half-inch house brick, totaling eighteen inches in thickness. Each wall was set upon a concrete footer. The Gumm's original application for the building permit issued by ODOT allowed for a drainage pipe to be installed under the driveway but did not mention the walls or concrete footer.
The Hurier's van flipped over after striking the pipe and wall. Constance Hurier died as a result of the injuries sustained in the accident, and Natalie was severely injured. Gabriel sustained minor injuries.
On January 17, 1995, appellants filed a complaint against ODOT, alleging that ODOT was negligent for allowing a drainage pipe and brick walls to exist within a clear zone of a highway maintained by ODOT and that the brick walls constituted an absolute or qualified nuisance. On October 30, 2000, the issue of liability was tried before the court. At the close of appellants' case, ODOT moved for an involuntary dismissal, which the court denied. On October 25, 2001, the court issued a written decision and judgment in favor of ODOT. We also note that appellants filed an action in the Clermont County Court of Common Pleas against the Gumms. In Hurier v. Gumm (Nov. 1, 1999), Clermont App. No. CA99-01-005, the appellate court affirmed the trial court's granting of summary judgment in favor of the Gumms. In the present case, appellants appeal the Court of Claims' judgment, asserting the following two assignments of error:
"[I.] The trial court erred as a matter of law by entering judgment against Plaintiffs and for Defendant on Plaintiffs' claims of absolute and qualified nuisance[.]
"[II.] The trial court erred as a matter of law by entering judgment for Defendant on Plaintiffs' claims of negligence[.]"
We will address both of appellants' assignments of error together. Appellants argue in their first assignment of error the trial court erred in entering judgment against them and for ODOT on their claims of absolute and qualified nuisance. Appellants argue in their second assignment of error the trial court erred by entering judgment for ODOT on their negligence claim. "Nuisance" is a term used to designate "the wrongful invasion of a legal right or interest." Taylor v. Cincinnati (1944), 143 Ohio St. 426, 432. The liability of the defendant, as well as the plaintiff's entitlement to relief, will depend upon both the nature of the alleged nuisance and the conduct of the defendant. Nuisance may be first designated as "private" or "public." Brown v. Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 712. Both of these types of nuisances may then be further categorized as "absolute nuisance" (nuisance per se) or "qualified nuisance." Taylor, at paragraphs two and three of the syllabus.
Appellants' claims are based upon a "public nuisance." A "public nuisance" is "an unreasonable interference with a right common to the general public." Id. at 712. A public nuisance will not arise because a large number of people are affected. Rather, it arises only when a public right has been affected. Id. To recover damages under a claim of public nuisance, a plaintiff must first establish an interference with a public right and second that the plaintiff has suffered an injury distinct from that suffered by the public at large. Miller v. W. Carrollton (1993),91 Ohio App.3d 291, 295-296. The harm suffered by the plaintiff must be different in kind, rather than in degree, from that suffered by other members of the public exercising the public right. Id.
"Nuisance" may be further divided into "absolute nuisance" and "qualified nuisance." The distinction between the categories is not the right or injury asserted. Rather, the distinction between "absolute" and "qualified" nuisance depends upon the conduct of the defendant. Hurier, supra. In the present case, appellants contend the brick walls constituted an absolute nuisance or, alternatively, a qualified nuisance.
"Absolute" nuisance is that for which strict liability will attach. Taylor, at paragraph two of the syllabus. An absolute nuisance consists of: (1) a culpable and intentional act resulting in harm; (2) an act involving culpable and unlawful conduct causing unintentional harm; or (3) a nonculpable act resulting in accidental harm, for which, because of the hazards involved, absolute liability attaches notwithstanding the absence of fault. Metzger v. The Pennsylvania, Ohio Detroit RR. Co. (1946), 146 Ohio St. 406, paragraph one of the syllabus. Strict liability will arise where one does or allows anything to be done "without just cause or excuse, the necessary consequence of which interferes with or annoys another in the enjoyment of his legal rights * * *." Taylor, at paragraph two of the syllabus.
When a defendant commits an unlawful act that is deemed to be an absolute nuisance, a defendant becomes an "insurer" and will be liable for "loss resulting from harm which may happen in consequence of it to persons exercising ordinary care, irrespective of the degree of skill and diligence exercised by himself * * * to prevent such injury." Id. at 434. Strict liability will also attach when one is using one's land or property for activities, which are unreasonably hazardous. Id. Under such circumstances, one is under a duty to confine any such hazard. Failure to do so will make one "prima facie answerable for all the damage which is the natural consequence of its escape." Id. at 435. In short, when one commits an unlawful act or is involved in an abnormally dangerous activity, the court considers such activities to be "inherently injurious" and incapable of being "conducted without damaging someone else's property or rights," and strict liability attaches to the activity. Brown, supra, at 713.
Appellants argue that the brick-wall structure fell within the second category of "absolute nuisance" (unlawful conduct causing unintentional harm). An example of the second category of absolute nuisance is the violation of a safety statute; the violation of a specific legal requirement established for the protection of others imposes absolute liability regardless of the degree of care used. Taylor, at 433. In the present case, appellants contend that ODOT permitted an absolute nuisance to exist on a right-of-way when it allowed an illegal structure to be built that was not included in the permit application or when it failed to inspect the site after construction was completed, thus failing to discover the illegal structure. Thus, in order for appellants to be successful on their claim against ODOT under the theory of absolute nuisance, they must demonstrate that the construction of the walls was illegal.
Before a property owner may build any obstruction upon a road or highway or a right-of-way, the owner must seek a permit under R.C.5515.03, which provides, in pertinent part:
"Occupants of land situated along the roads and highways of the state highway system shall remove all obstructions within the bounds of such roads and highways which have been placed there either by themselves or their agents, or with their consent, and not under a franchise or permit legally granted. * * *
"No individual, firm, or corporation shall place or maintain any post, sign, or obstruction within the bounds of any road or highway on the state highway system without first obtaining the consent and approval of the director."
The walls in the present case were constructed in the right-of-way of the highway, and, thus, would generally be considered part of the road or highway. See R.C. 5515.01(C) and 4511.01(UU)(2).
The Court of Claims found that the decorative walls were not illegally constructed, relying upon the reasoning given by the Clermont County Court of Appeals in the related action against the property owners, the Gumms, in Hurier, supra. In Hurier, the appellate court found that the Gumms constructed the walls pursuant to a legal permit issued by ODOT. The court found: (1) the permit application required only a general description of the work to be performed, as well as a plan for the proposed construction; (2) the plan was required to contain the location and dimensions of the proposed driveway bridge; (3) it was clear that the focus of the application permit was not whether decorative structures could be attached to the driveway bridge; rather, the permit application included numerous details and restrictions concerning drainage and the restoration of any roadside landscaping which would be disturbed by the construction; and (4) the permit indicated that any approved construction could be done only upon inspection, and appellants did not demonstrate that any part of the construction was objected to by the inspector.
Appellants counter that there is no evidence ODOT ever performed an actual inspection of the brick walls. We agree that there is no direct evidence that ODOT inspected the brick walls after construction. However, Paul Box, ODOT's engineering expert, opined that there was an inspection made because it was ODOT's custom and practice to inspect the completed structure after issuing a permit. Further, he testified that it could be presumed that ODOT gave tacit approval of the brick walls, given that the walls remained and ODOT did not require the Gumms to remove them. He stated that surely ODOT would have inspected the site after completion of the project, and the mere fact that the brick walls remained was compelling evidence that the inspector approved the walls upon inspection.
Appellants admit they have presented no evidence to support their claim that ODOT did not inspect and approve the brick walls. Although it is their wish that this court shift the burden of proof upon ODOT to prove that it inspected and approved the walls in question rather than require them to prove a negative proposition, we decline to do such. It is true that some areas of law shift the burden under certain circumstances, but we find no support for doing such under the circumstances in the present case. Therefore, we find that appellants have failed to sustain their burden that the walls were constructed illegally without ODOT's approval and consent. The only evidence on the issue was the testimony of Mr. Box, who opined that ODOT surely inspected the walls pursuant to the permit process, and, by virtue of the fact that they still exist, ODOT clearly approved the construction. Accordingly, there can be no absolute nuisance in the present case when there was no underlying unlawful or illegal conduct causing unintentional harm.
Appellants argue alternatively that the brick structure was a qualified nuisance. A qualified nuisance is premised upon negligence. To recover damages for a qualified nuisance, negligence must be averred and proven. Brown, supra, at 713, 715; Allen Freight Lines, Inc. v. Consol. Rail Corp. (1992), 64 Ohio St.3d 274, 276. A qualified nuisance is a lawful act "so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another." Metzger, at paragraph two of the syllabus. Under such circumstances, the nuisance arises from a failure to exercise due care. Taylor, at 43. Thus, the allegations of nuisance and negligence therefore merge, as the nuisance claims rely upon a finding of negligence. Allen Freight Lines, Inc., at 276, quoting Taylor, at 441. Thus, we will address the claims for qualified nuisance and negligence together.
In order to prove actionable negligence, appellants were required to prove that ODOT owed them a duty, that ODOT breached that duty, and that the breach proximately caused them injuries. Strother v. Hutchinson (1981), 67 Ohio St.2d 282. Although ODOT is not an insurer of the safety of its highways, ODOT owed appellants a duty of care. It is well-established that ODOT has a duty to maintain its highways in a reasonably safe condition for the motoring public. Knickel v. Dept. of Transportation (1976), 49 Ohio App.2d 335. See, also, Rhodus v. Ohio Dept. of Transp. (1990), 67 Ohio App.3d 723.
In the present case, appellants argue ODOT negligently permitted the brick walls to be constructed and maintained on the Gumms' property, creating a qualified nuisance. Appellants first assert that ODOT breached its duty to the motoring public by allowing a structure that violated the "clear zone" safety design standard promulgated by the American Association of State Highway and Transportation Officials ("AASHTO"). We first note that we are unable to review the sections in the various AASHTO Roadside Design Guides ("guides") regarding clear zones. Pursuant to App.R. 9 and Loc.R. 3, an appellant has the burden of providing the materials necessary for review. See Volodkevich v. Volodkevich (1989),48 Ohio App.3d 313, 314. The record received by this court does not contain copies of the 1977 and 1989 AASHTO guides, to which the parties' experts refer.
Notwithstanding our inability to review the AASHTO guides, we find AASHTO does not establish ODOT's duty in the present case for two reasons. ODOT's expert, Paul Box, testified that AASHTO's publications are guidelines only, not standards. It has been held on numerous occasions that the AASHTO guidelines are not mandatory and are phrased in aspirational rather than mandatory language. See Neiderbrach v. Dayton Power Light Co. (1994), 94 Ohio App.3d 334; Jocek v. GTE North, Inc. (Sept. 27, 1995), Summit App. No. 17097. Thus, ODOT was not required to follow the AASHTO guidelines.
Further, neither the 1977 nor 1989 AASHTO guidelines regarding clear zones are even applicable to the present case. The Gumms' brick walls were built in 1973, and the first national guidelines regarding clear zones were not published by AASHTO until 1977. When there are no guidelines in place at the time of the act, the proper standard of care is that of a reasonable engineer using accepted practices at the time of the act. Lunar v. Ohio Dept. of Transp. (1989), 61 Ohio App.3d 143, 147. Mr. Box testified that clear zones were not the standard of care for states in 1973, and the clear zone concept had not been established at that time. Mr. Box testified that the United States did not first begin using clear zones until after 1977, and most of its use began in the late 1970's and early 1980's. Mr. Box further testified that the 1977 clear zone guidelines were considered preliminary. Therefore, we find the AASHTO guides did not establish a standard of care for ODOT with regard to clear zones in this case.
Appellants also assert that ODOT breached its duty to the motoring public by allowing a structure that violated several requirements in ODOT's Location and Design Manual ("LD manual" or "manual"). As with the AASHTO guides, we do not have a copy of ODOT's LD manuals to review; thus, if we are to review this issue, we must rely on the testimony presented at trial, quotations contained in the trial court's decision below, and any quotations included in the report completed by appellants' expert, Thomas Huston, and attached to his deposition.
Appellants first assert that ODOT negligently allowed a structure that violated the "clear zone" requirements in the LD manual. We disagree. The manual in force at the time of the accident was published in 1990. Mr. Box testified that the 1990 manual was the first to contain clear zone guidelines; thus, there were no guidelines contained in prior manuals that would have required clear zones during the original construction of the walls in 1973. Mr. Box further stated that the 1990 LD manual guidelines addressing clear zones applied only to new construction. Therefore, neither the 1990 manual nor any prior manual required ODOT to satisfy any clear zone guidelines with regard to the brick walls.
Appellants also assert that section 307.27 of the 1990 LD manual placed a duty upon ODOT to order the removal of the brick walls or bury the drainage pipe. However, section 307.27 of the manual, which was quoted by both the trial court and Mr. Huston, indicates that the requirements for pipe location should be applied only to new construction, reconstruction, widening projects, and surfacing projects only if regrading of the roadside to safety or clear zone grading is included in the work. Mr. Box stated that he contacted ODOT and found that no construction or widening had been completed in the area of the accident between 1990 and 1993. ODOT did resurface the highway in 1991, and there was maintenance work (asphalt patching) done at the approximate location of the accident in 1992 and part of 1993. However, none of this work included any grading work, and, thus, section 307.27 would not apply.
Further, it is well-established that ODOT does not have a duty to upgrade highways to current design standards when acting in the course of maintenance. Lunar, supra, at 149. Maintenance involves only the preservation of existing highway facilities, rather than the initiation of substantial improvements. Wiebelt v. Ohio Dept. of Transp. (June 24, 1993), Franklin App. No. 93AP-117. As stated above, only maintenance work was performed on the road after the 1990 manual came into effect. Because no substantial reconstruction occurred between 1990 and the time of the accident, ODOT was not required to remove the brick walls or relocate the pipe according to the current design guidelines contained in the 1990 ODOT LD manual. Therefore, we find the ODOT LD manual did not establish a standard of care for ODOT with regard to clear zones in this case.
Appellants next argue that ODOT was negligent in breaching its duty established by R.C. 5515.02 to compel landowners to remove structures that interfered with the safety of traffic. R.C. 5515.02 provides, in pertinent part:
"All individuals * * * using or occupying any part of a road or highway on the state highway system with * * * any object or structure, other than by virtue of a franchise or permit granted and in force, shall remove from the bounds of the road or highway, their * * * objects or structures, when in the opinion of the director of transportation they constitute obstructions, or they interfere or may interfere with * * * use by the traveling public of the roads or highways.
"All individuals * * * so occupying any road or highway on the state highway system * * * by virtue of a franchise or permit granted and in force, shall relocate their properties and all parts thereof within the bounds of the road or highway when in the opinion of the director they constitute obstructions, or they interfere with or may interfere with the * * * use of the road or highway. The relocation within the bounds of the road or highway shall be in the manner and to the extent prescribed by the director.
"If, in the opinion of the director, such individuals * * * have obstructed any road or highway on the state highway system, or if any of their properties are so located that they do or may interfere with the * * * use of the road or highway, the director shall notify such individual * * * directing the removal of the obstruction or properties, or the relocation of the properties. * * *
"If, in the director's opinion, the obstruction or properties present an immediate and serious threat to the safety of the traveling public, the director may remove or relocate the obstruction or properties without prior notice.
* * *
"As used in this section, `road' or `highway' has the same meaning as in section 5501.01 of the Revised Code and also includes any part of the right of way."
Thus, R.C. 5515.02 makes clear that once a permit has been issued and a structure is lawfully erected, the director of ODOT has the discretion to determine whether, at a later date, the structure has become an impediment to travel upon the road or highway or if it poses an immediate and serious threat.
Appellants assert that there can be no explanation why the director would not exercise such discretion and require the Gumms to remove the brick walls. We disagree. There is sufficient evidence to support a finding that ODOT could have considered the brick walls were not an obstruction that would interfere with or constitute an immediate and serious threat to the traveling public. There had only been one prior accident that had occurred involving the wall in the previous twenty years, and that involved an intoxicated motorcyclist in 1975. Thus, ODOT would not have been put on notice based upon similar past events involving the walls. Appellants also presented no evidence demonstrating that any motorist or landowner had complained about the brick walls. Further, Mr. Box testified that ODOT did not have reason to expect or foresee a collision with the walls and Hurier's van. He stated that the brick walls were not in a very vulnerable location because the closest edge of the wall was fourteen feet from the edge of the road. He also testified that the wall was not a "formidable" object, being comprised of relatively light-duty materials. As indicated above, Mr. Box testified that the walls were not in violation of any law or guideline at the time they were constructed, and the 1990 ODOT manual applied the clear zone guidelines to only new construction, of which there had been none from 1990 to 1993. As a result, Mr. Box concluded that ODOT did not deviate from its standard of care and was not negligent. Based upon this evidence, we find that ODOT could not be negligent for abusing its discretion under R.C. 5515.02.
Therefore, we find appellants failed to demonstrate that ODOT breached any duty owed to the motoring public, including appellants, and, thus, it cannot be found negligent. Because ODOT was not negligent, we further find that neither the walls nor the drainage pipe were a qualified nuisance that ODOT permitted to be constructed and maintained. ODOT's actions were not so carelessly done as to create a potential and unreasonable risk of harm, which in due course resulted in injury to another. We also find appellants failed to demonstrate that the brick walls and drainage pipe were absolute nuisances. Because of our disposition on the issues of absolute nuisance, qualified nuisance, and negligence, we need not reach the issue of Gabriel Hurier's negligence and proximate cause. Therefore, for the foregoing reasons, appellants' first and second assignments of error are overruled.
ODOT has filed a cross-assignment of error, which states:
"The trial court erred as a matter of law by not granting ODOT's motion for an involuntary dismissal."
Because we have overruled appellants' assignments of error and affirmed the judgment of the trial court, we need not address this cross-assignment of error. See R.C. 2505.22; App.R. 12(A)(1)(c).
Accordingly, we find that the Court of Claims did not err in rendering judgment in favor of ODOT. Appellants' two assignments of error are overruled, ODOT'S cross-assignment of error is moot, and the judgment of the Ohio Court of Claims is affirmed.
Judgment affirmed.
LAZARUS and BOWMAN, JJ., concur.